CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Scott J. Witlin (SBN 137413), Gloria C. Jan (SBN 165440)<br>Barnes & Thornburg LLP, 2029 Century Park East Suite 300, Los Angeles, CA 90067<br>Gregory A. Nylen (SBN 151129)<br>Lobb & Cliff, LLP, 1650 Spruce Street, Suite 410, Riverside, CA 92507 | **F I L E D**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN BERNARDINO<br>SAN BERNARDINO DISTRICT |
| TELEPHONE NO.: 310.284.3880    FAX NO.: 310.284.3894 | OCT 0 7 2016 |
| ATTORNEY FOR *(Name):* Sean Mykleby and ThermoMagnetics & Cryogens, Inc. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Bernardino
STREET ADDRESS: 172 W 3rd Street
MAILING ADDRESS: 172 W 3rd Street
CITY AND ZIP CODE: San Bernardino, CA 92415
BRANCH NAME:

BY _____
JESSICA MORALES, DEPUTY

CASE NAME:
ThermoMagnetics & Cryogens, Inc. et al. v. Pittsburgh Universal, LLC

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>CIVDS1616902 |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[✓] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties
  b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. [ ] Substantial amount of documentary evidence
  d. [ ] Large number of witnesses
  e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
**4.** Number of causes of action *(specify):* two
**5.** This case [ ] is  [✓] is not  a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 7, 2016
Gloria C. Jan (SBN 165440)
_____    _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

**EXHIBIT**
1

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
 Damage/Wrongful Death
Uninsured Motorist (46) *(if the
 case involves an uninsured
 motorist claim subject to
 arbitration, check this item
 instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/
  Wrongful Death
Product Liability *(not asbestos or
 toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice–
  Physicians & Surgeons
 Other Professional Health Care
  Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip
  and fall)
 Intentional Bodily Injury/PD/WD
  (e.g., assault, vandalism)
 Intentional Infliction of
  Emotional Distress
 Negligent Infliction of
  Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
 Practice (07)
Civil Rights (e.g., discrimination,
 false arrest) *(not civil
 harassment)* (08)
Defamation (e.g., slander, libel)
 (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice
  *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease
  Contract *(not unlawful detainer
   or wrongful eviction)*
 Contract/Warranty Breach–Seller
  Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract/
  Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open
 book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections
  Case
Insurance Coverage *(not provisionally
 complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
 Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent
  domain, landlord/tenant, or
  foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
 drugs, check this item; otherwise,
 report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court
  Case Matter
 Writ–Other Limited Court Case
  Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor
  Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
 *(arising from provisionally complex
 case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of
  County)
 Confession of Judgment *(non-
  domestic relations)*
 Sister State Judgment
 Administrative Agency Award
  *(not unpaid taxes)*
 Petition/Certification of Entry of
  Judgment on Unpaid Taxes
 Other Enforcement of Judgment
  Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
 above)* (42)
 Declaratory Relief Only
 Injunctive Relief Only *(non-
  harassment)*
 Mechanics Lien
 Other Commercial Complaint
  Case *(non-tort/non-complex)*
 Other Civil Complaint
  *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
 Governance (21)
Other Petition *(not specified
 above)* (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult
  Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late
  Claim
 Other Civil Petition

CM-010 [Rev. July 1, 2007]                    **CIVIL CASE COVER SHEET**

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

OCT 0 7 2016

BY _____
JESSICA MORALES, DEPUTY

1   SCOTT J. WITLIN (SBN 137413)
    switlin@btlaw.com
2   GLORIA C. JAN (SBN 165440)
    gjan@btlaw.com
3   **BARNES & THORNBURG LLP**
4   2029 Century Park East, Suite 300
    Los Angeles, California 90067
5   Telephone:   310.284.3880
    Facsimile:   310.284.3894
6

7   Attorneys for Plaintiff
    SEAN MYKLEBY
8

9   GREGORY A. NYLEN (SBN 151129)
    gnylen@lobbcliff.com
10  **LOBB & CLIFF, LLP**
    1650 Spruce Street, Suite 410
11  Riverside, California 92507
    Telephone:   951.788.9410
12  Facsimile:   951.788.0766

13  Attorneys for Plaintiff
    THERMOMAGNETICS & CRYOGENS, INC.
14

15              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

16                   FOR THE COUNTY OF SAN BERNARDINO

17

18  THERMOMAGNETICS & CRYOGENS,           Case No.:   CIVDS1616902
    INC., a California corporation, and SEAN
19  MYKLEBY, an individual,               **COMPLAINT FOR DAMAGES AND
                                          DECLARATORY RELIEF**
20
                         Plaintiffs,
21              v.
22  PITTSBURGH UNIVERSAL, LLC d/b/a
    COOL PAIR PLUS, a limited liability
23  company, and DOES 1-10,

24
                         Defendants.
25

26

27

28

                COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs THERMOMAGNETICS & CRYOGENS, INC. and SEAN MYKLEBY for their Complaint against PITTSBURGH UNIVERSAL, LLC d/b/a COOL PAIR PLUS, allege as follows:

## I.

## GENERAL ALLEGATIONS

1.     Plaintiff THERMOMAGNETICS & CRYOGENS, INC. ("TMC" or "Plaintiff") is, and at all times relevant to this Complaint was, a California corporation with its principal place of business in the County of San Bernardino in the State of California.

2.     Plaintiff SEAN MYKLEBY ("Mykleby" or "Plaintiff") is a California citizen and resident of the County of Orange in the State of California.

3.      Defendant PITTSBURGH UNIVERSAL, LLC d/b/a COOL PAIR PLUS ("Cool Pair" or "Defendant") is, and at all times relevant to this Complaint was, a limited liability company in the State of Pennsylvania with its principal place of business in the State of Illinois.

## II.

## FACTUAL ALLEGATIONS

4.     TMC is a corporation formed to service cryogenic equipment used in medical, research, and government facilities.

5.     Mykleby worked for Cool Pair as a Senior Cryogenic Technician from March 2011 through September 6, 2016.  Mykleby entered into an Employment Agreement with Cool Pair dated March 4, 2011, a true and correct copy of which is attached to this Complaint as Exhibit A (the "Agreement").

6.     Mykleby's primary responsibility was the sales and repair of Sumitomo model cold heads.  A cold head is a heat pump that removes heat from a device such as a magnetic resonance imaging (MRI) machine.  Mykleby's primary responsibility was the sales and repair of Sumitomo model cold heads.  A cold head is a heat pump that removes heat from a device such as a magnetic resonance imaging (MRI) machine.

7.     Mykleby had worked in this field and developed his expertise, skill and knowledge for more than ten (10) years before joining Cool Pair in 2011.  He acquired his technological expertise while working for previous employers, not only in the medical field but also with research facilities,

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

1    government entities, and industrial applications.

2        8.    Pursuant to Paragraph 4.2 of the Agreement, Mykleby was entitled to payment of a

3    "Cold Head Repair Bonus" for each Sumitomo model cold head that was successfully repaired, to be

4    paid on a monthly basis based for any cold head shipped in the previous month.  The Agreement

5    provided for $525 for each cold head, subject to an annual adjustment.  The bonus structure was

6    revised to provide for a bonus of $480 per cold head shipped for field service events and a bonus of

7    10% of the sale price for part sales.

8        9.    Section 6 of the Agreement purports to impose a number of restrictive covenants on

9    Mykleby, including a limitation on the use of confidential information, non-solicitation of employees

10    and customers, and a covenant not to compete.

11          a.    Paragraph 6.2 explicitly excludes the "refurbishment processes for Sumitomo

12                cold heads" from the definition of Confidential Information.

13          b.    Paragraph 6.7 provides as follows:

14                Subject to Section 6.9, the Employee shall not, during his

15                employment with the Company, alone or in conjunction with any

16                other Person, whether as an employee, consultant, sole proprietor,

17                partner, shareholder, officer, director, joint venture, investor or in

18                any other capacity, directly or indirectly, engage in any Similar

19                Business anywhere in the United States of America.

20          c.    Paragraph 6.8 provides that the non-competition covenant does not apply to the

21                Employee "in the event that Employee's employment with the Company is

22                terminated by the Company without Cause."

23      10.    Mykleby's employment with Cool Pair ended on September 6, 2016.

24      11.    Prior to that date, Cool Pair had made numerous efforts to force Mykleby to resign,

25    including but not limited to mispresenting the circumstances of a potential sale of the company to

26    induce him to agree to a revised employment agreement; forcing him to pay out of his own pocket for

27    company expenses; and creating trumped-up disciplinary write-ups for non-existent performance

28    issues or situations that had been approved by his manager.

12.     Ultimately, one of the owners of Cool Pair, David Baldwin, announced to Mykleby on or about May 28, 2016, that he should quit.

13.     Cool Pair constructively discharged Mykleby by effectively forcing him to resign. Cool Pair knowingly created or permitted work conditions that were so intolerable that any reasonable person in Mykleby's position would be compelled to resign. *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1244–1245 (1994) ("constructive discharge is legally regarded as a firing rather than a resignation").

14.     In addition, Cool Pair failed to pay Mykleby the Cold Head Repair Bonus on 129 Sumitomo cold heads that were shipped, sold and/or serviced by Mykleby, in violation of paragraph 4.2 of his Agreement. The amount of unpaid bonuses totaled $58,953.00.

15.     Mykleby accepted employment with TMC effective September 7, 2016.

16.     On September 6, 2016, Cool Pair's counsel sent Mykleby a letter reminding him of the terms of his Agreement, and asking him to identify his new employer.  A true and correct copy of this letter is attached to this Complaint as Exhibit B.

17.     On September 9, 2016, Cool Pair's counsel sent Mykleby another letter demanding the return of his personal notebooks he maintained during his employment. A true and correct copy of this letter is attached to this Complaint as Exhibit C.

18.     On September 16, 2016, Mykleby's undersigned counsel sent Cool Pair's counsel the notebooks and a cover letter identifying TMC as his new employer here in California.  A true and correct copy of the cover letter is attached to this Complaint as Exhibit D.

19.     On September 28, 2016, Cool Pair's counsel sent letters to TMC and Mykleby (through counsel) seeking to enforce the non-competition provision in the Agreement.  True and correct copies of these letters are attached to this Complaint as Exhibits E and F, respectively (collectively, the "Demand Letters").

     a.     The Demand Letter to TMC (Exhibit E) advises that Mykleby is subject to "a number of restrictive covenants," including a non-compete clause whereby he cannot work for a competitor or otherwise engage in a similar business anywhere in the United States, non-solicitation clauses for employees and

1   customers, and a confidential information provision.

2   b. The Demand Letter further advises that Cool Pair has information suggesting

3    that TMC intends to start a cold head repair business to compete with Cool Pair,

4    and requests that TMC either terminate its relationship with Mykleby or provide

5    evidence that his work will not violate his Agreement.

6   c. Finally, the Demand Letter threatens to commence legal action to enforce its

7    rights, including obtaining an injunction.

8   d. The Demand Letter to Mykleby (Exhibit F) contains substantially the same

9    assertions.

## III.

## JURISDICTION AND VENUE

12  20. Pursuant to Article VI, § 10 of the California Constitution, this court has original

13 jurisdiction over these claims.  Jurisdiction is also proper pursuant to Cal. Civ. Proc. Code §§ 410.10,

14 410.50 and 1060.  On Plaintiffs' claim for declaratory relief, this Court has jurisdiction pursuant to Cal.

15 Civ. Proc. Code § 1060 because Plaintiffs seek a declaration of rights and duties under a written

16 contract.

17  21. Venue is proper in the Superior Court of California, County of San Bernardino pursuant

18 to Cal. Civ. Proc. Code § 395.5.

19   a. Upon information and belief, Cool Pair does business in California and in the

20    chosen county in particular.

21   b. Plaintiff TMC has its headquarters and principal place of business in Ontario,

22    which is located in San Bernardino County, as of the filing of this Complaint.

23   c. By way of the Demand Letters, Cool Pair has asserted that if TMC is engaging

24    in a competing business, Mykleby's employment with TMC "is a direct breach

25    of his Covenant Not to Compete" (Exhibit F, page 2) and that TMC "would be

26    tortiously interfering with Cool Pair's Agreement with Mr. Mykleby by

27    employing him in violation of his non-compete" (Exhibit E, page 2),  Cool Pair

28    further asserts that if TMC and Mykleby do not comply with its requests, it will

1         "be forced to commence legal action to enforce its rights, will request immediate

2         entry of an injunction, and will seek reimbursement of any and all damages

3         incurred by Cool Pair as a result of Mr. Mykelby's and TMC's actions." (Exhibit

4         E, page 2).

5         d.    Since TMC's principal place of business is located in San Bernardino County,

6         any alleged breach or tortious conduct asserted by Cool Pair against Plaintiffs

7         would occur within the county, and any liability would arise in the county.  If

8         Cool Pair were to file suit asserting its claims against Plaintiffs, venue in San

9         Bernardino would be proper.  Therefore, Plaintiffs' action for declaratory relief

10        challenging the basis for any such suit may also be brought in the same county.

11        See *Mission Imports, Inc. v. Superior Court*, 31 Cal. 3d 921, 930 (1982) (venue

12        for declaratory relief action seeking "declaratory exoneration from an alleged

13        liability shown to be asserted by the defendant . . . .is determined with reference

14        to the subject matter of the defendant's accrued cause of action"; citing *Shores v.*

15        *Chip Steak Co.*, 130 Cal. App. 2d 620 (1955) holding that venue for declaratory

16        relief action claiming defendants did not have grounds for trademark

17        infringement action was proper where plaintiff's alleged liability for

18        infringement arose).

19      22.    California law is well-settled that the strong public policy behind Section 16600 of the

20  California Business & Professions Code overrides any contractual provision designating another state's

21  law as controlling the validity of a non-compete clause. *See Application Group, Inc. v. Hunter Group,*

22  *Inc.*, 61 Cal. App. 4th 881, 902 (1998)  (finding California has a materially greater interest than the

23  selected state in the application of its law against non-competes, and that California's interests would

24  be more seriously impaired if its policy were subordinated to the policy of other state; California courts

25  are not bound to enforce a contractual conflict of law provision which would be contrary to this state's

26  fundamental policy against restrictive covenants).  Thus, any choice of law provision in the Agreement

27  would not be controlling here.

28  ///

23.     Further, TMC is not a party to the Agreement and is therefore not bound by any choice of venue provision. *Net2Phone, Inc. v. Superior Court*, 109 Cal. App. 4th 583, 596 (2003) ("Generally, a nonsignatory to an agreement is not bound by a forum selection clause in the agreement."). Moreover, forum selection clauses cannot be used to undercut the un-waivable protections of California law, such as the ban on non-competes in Section 16600. *See Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141, 144–45 (2015), *as modified on denial of reh'g* (June 25, 2015).

## IV.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT/FAILURE TO PAY COMMISSIONS)

### (By Plaintiff Mykleby)

24.     Plaintiff hereby incorporates by reference and re-alleges all paragraphs previously alleged in this Complaint as if fully set forth herein.

25.     Cool Pair and Mykleby entered into the Agreement, which provided for a Cold Head Repair Bonus in paragraph 4.2, as modified.

26.     Cool Pair breached the Agreement by failing to pay Mykleby the Cold Head Repair Bonus for 129 cold heads that were shipped, sold, and/or serviced by Mykleby, in the total amount of approximately $59,000.

27.     Mykleby is therefore entitled to recover these bonus amounts under the Agreement.

### SECOND CAUSE OF ACTION

### (DECLARATORY RELIEF)

### (By Plaintiffs TMC and Mykleby)

28.     Plaintiffs incorporate by this reference and re-alleges all paragraphs previously alleged in this Complaint as if fully set forth herein.

29.     An actual, present and justifiable controversy now exists between Plaintiffs and Cool Pair with respect to their respective rights and obligations under the Agreement, in particular with respect to the non-competition provision.

///

30.     Plaintiffs contend that the non-competition provision of the Agreement, paragraph 6.7, is invalid as a matter of California law because it is a direct violation of Section 16600 of the California Business & Professions Code.

31.     Plaintiffs further contend that by including the invalid non-competition provision in the Agreement and seeking to use it to prevent Mykleby from obtaining employment with TMC, Cool Pair engaged in "unfair competition" within the meaning of Section 17200 of the California Business & Professions Code.

32.     Plaintiffs further contend that the non-competition provision of the Agreement, paragraph 6.7, does not apply according to paragraph 6.8 because Mykleby was constructively discharged by Cool Pair without cause.

33.     Plaintiffs further contend that they are entitled to a declaration that, pursuant to sections 16600 and 17200, Cool Pair is precluded from enforcing in California any out-of-state judgment or injunction it might obtain which upholds the validity of the Agreement's covenant not to compete.

34.     Cool Pair has made contrary contentions and put the provision in dispute through its written notification of its intent to enforce the provision and to pursue court action if TMC and Mykleby do not sever their relationship or agree not to compete with Cool Pair. See Exhibits E & F.

35.     Plaintiffs are now entitled to a declaration of the parties' respective rights and obligations under the Agreement: (a) to avoid a multiplicity of actions; (b) so that the parties will know their rights, duties and obligations under the Agreement; and (c) so that Plaintiff Mykleby will be able to work in his chosen profession without undue interference. Specifically, Plaintiffs are entitled to a declaration that its contentions, as set forth in Paragraphs 30-33 are correct. Plaintiffs seek prompt declaratory judgment so that the rights of the parties may be determined. The potential limitations on Mykleby's ability to earn a living and TMC's ability to conduct its business warrant prompt resolution of this controversy.

///

///

///

///

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against and relief from Defendant as follows:

1.   Under the First Claim, for compensatory damages according to proof;

2.   Under the Second Claim, for a declaration of the parties' rights, duties and obligations under the Agreement, and specifically a declaration that Plaintiffs' contentions are correct;

3.   For pre-judgment interest in accordance with law;

4.   For Injunctive and other appropriate equitable relief;

5.   For reasonable attorneys' fees and expenses;

6.   For taxable costs;

7.   Such other and further relief as the Court deems appropriate.


Dated: October 7, 2016                    **BARNES & THORNBURG LLP**


                                          By _____
                                                Scott J. Witlin
                                                Gloria C. Jan
                                          Attorneys for Plaintiff Sean Mykleby


                                          **LOBB & CLIFF, LLP**


                                          By _____
                                                Gregory A. Nylen
                                          Attorneys for Plaintiff ThermoMagnetics &
                                                Cryogens, Inc.


8

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

# EXHIBIT A

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "**Agreement**") is effective this _MARCH 4, 2011_ (the "**Effective Date**"), by and between **PITTSBURGH UNIVERSAL, LLC** d/b/a **COOL PAIR PLUS**, a Pennsylvania limited liability company (hereinafter, the "**Company**"), and Sean Mykleby, residing at _511 E HACKBERRY D_ _A.H. 1 60004_ (hereinafter, the "**Employee**"). The Company and the Employee are sometimes each referred to herein as a "**Party**" and collectively as the "**Parties**,"

### WITNESSETH:

**WHEREAS,** the Company is engaged in the business of providing repair, refurbishment, installation and support services for cryogenic refrigeration equipment, coldheads, compressors, flexlines, absorbers and other related parts for MRI systems, industrial vacuum pumps and other research applications; and

**WHEREAS,** the Employee recognizes that the Company has a legitimate business interest in protecting its proprietary, secret and confidential information and acknowledges the need of the Company to impose certain restrictions upon the Employee in order to safeguard its ability to effectively compete in its industry during, and for a reasonable period after the natural expiration or earlier termination of, the term of the Employee's employment with the Company;

**WHEREAS,** Employee has been working for Employer since _AUGUST_, 2010, with the understanding and acknowledgement that this Agreement would be executed at a later date, but that this Agreement would be effective as of the Effective Date,

**NOW, THEREFORE,** in consideration of the mutual covenants and conditions herein contained, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.     **EMPLOYMENT**.   The Company employs the Employee as a Sr. Cryogenic Technician, and the Employee has accepted such employment. The Employee agrees to perform his duties and the responsibilities provided for herein in accordance with the terms and conditions of this Agreement. The Employee acknowledges and agrees that the Company may change his title and his duties from time to time as the interests of the Company require, as determined in the sole and exclusive discretion of the Company.

2.     **AT WILL EMPLOYMENT**.   Employee acknowledges and agrees that his employment with Company is and always shall be "at-will". Employee also acknowledges and agrees that Company may, within it sole discretion, amend or change from time to time any employment practices, policies or procedures not expressly governed by the terms of this Agreement. Employee's employment pursuant to the terms of this Agreement shall commence on the Effective Date written above and shall continue until Employee's employment is terminated by the Employee or the Company.

3.     **RESPONSIBILITIES**.

3.1     **Duties**. At all times during the term of his employment with the Company, the Employee shall perform such duties as shall reasonably be assigned by the Company from

time to time.  These duties will include but are not limited to conducting field service for MRI magnet maintenance (including cold head, compressor and flexline repair and replacement, cryogen filling and other magnet maintenance), in-house repairs to cryogenic cooling components (oil absorbers, flexlines, compressors and cold heads).

3.2   **Duty of Loyalty.**  At all times during the term of this Agreement, the Employee shall devote his full working time, energy and skills to the performance of services for the Company hereunder and shall refrain from engaging in any other work or business activity which interferes with the Employee's performance of his duties hereunder.  This covenant is in addition to, and shall not be construed in any manner as limiting, the Employee's other covenants contained within this Agreement.

4.   **COMPENSATION AND BENEFITS.**

4.1   **Base Salary and Initial Bonus Payment.**  The Employee shall receive an initial base salary of $100,000 per year, payable in accordance with the standard payroll practices of the Company.  Increases to base salary, if any, shall be at the discretion of the Company.  In addition, as an incentive to execute this Agreement after the Effective Date, Employee will receive a one time payment of $1,000.  Employee acknowledges and agrees that this one time payment is additional consideration for the Employee's agreement to be bound by the restrictive covenants contained in Article 6, that the Company would not employ the Employee after the Effective Date without Employee's agreement to be bound by the restrictive covenants made by Employee in Article 6 and the consideration provided by the Company to the Employee pursuant to this Agreement is sufficient and adequate consideration for Employee's agreement to be bound by the terms of this Agreement including, without limitation, the restrictive covenants made by Employee in Article 6.

4.2   **Cold Head Repair Bonus.**  The Employee shall also receive, in addition to his Bas Salary, a bonus payment of $525 for each Sumitomo model cold head that is successfully repaired and performs for 12 months without a verified customer warranty claim.  This bonus is payable monthly based on the previous month's cold head shipments.  Annual adjustments to the per-cold head bonus amount may be completed based on a target of 10% of the cold head selling price.

4.3   **Employee Benefits.**  The Employee shall be entitled to participate, to the extent he is eligible under the terms and conditions thereof, in any hospitalization or medical insurance plans, disability insurance plans, life insurance plans, retirement or other employee or fringe benefit plans maintained by the Company, all in accordance with the applicable policies of the Company.  The Company shall be under no obligation to institute or continue the existence of any employee benefit plan and may from time to time amend, modify or terminate any such plan. The Employee shall be entitled to annual paid time off in accordance with the written policies of the Company.

4.4   **Withholding.**  All payments made by the Company under this Agreement will be reduced by any tax or other amounts legally required to be withheld by the Company under applicable law.

4.5    **Survival.** Provisions of this Agreement will survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, Section 3.2 and Articles 6 and 7 of this Agreement (each of which shall survive termination of this Agreement). Upon termination of the Employee's employment with the Company by either the Employee or the Company, all rights, duties and obligations of the Company to the Employee will cease, except as otherwise expressly provided in this Agreement.

4.6    **Severance.** In the event employment is terminated by the Company without cause, the Employee will be eligible for a severance payment equal to his previous year's W-2 earnings, payable in 12 monthly installments.

5.    **ASSIGNMENT.** The Employee shall not assign this Agreement without the prior written consent of the Company. The Company may assign this Agreement and the Employee hereby consents to any such assignment. This Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective heirs, legal representatives, successors and permitted assigns.

6.    **CERTAIN COVENANTS, REPRESENTATIONS AND WARRANTIES BY THE EMPLOYEE.**

6.1    **Restrictive Covenants.** This Agreement contains restrictive covenants made by the Employee. The Employee acknowledges that certain of the Company's personnel, methods of operation, business relationships, products and services are highly specialized and that the Confidential Information (as hereinafter defined) to which the Employee will have access is not generally known in the Company's industry. The Employee further acknowledges that the Company has a legitimate interest in protecting its ability to effectively compete in its industry and that it is reasonably necessary for the protection of the Company's business interests for the Employee to agree to the restrictive covenants set forth in this Agreement.

6.2    **Certain Definitions.** For purposes of this Agreement the following capitalized terms shall have the meanings ascribed to them below:

"**Cause**" shall mean any of the following:

(a)    Any omission, act or conduct on Employee's part that amounts to gross negligence or willful misconduct to the detriment of the Company or that has materially injured the business or reputation of the Company or that has otherwise materially and adversely affected the interest of the Company or that might so materially injure the business and reputation of the Company or so affect its interest if Employee were retained as an employee including, but not limited to, acts of violence, dishonesty, embezzlement, fraud, misappropriation, conviction of a crime (other than a summary offense), substance abuse or a plea of nolo contendere with respect to any of these actions;

(b)    Willfully destroying Employer's property.

"**Confidential Information**" shall mean all oral, written or other confidential and proprietary information or ideas in any form, tangible or intangible, of or

relating to the Company or its business including, but not limited to, information pertaining in any manner to the business or affairs, financial or otherwise, of the Company or any of its employees, Customers, consultants or business associates. Confidential Information includes, without limitation: designs, inventions, innovations, patents, patent applications, discoveries, improvements, specifications, data, know-how, formats, test results, documentation, components, business and product plans, contracts and agreements, service offerings, specifications, financial information, customer lists, supplier lists, formulas, research techniques, research results, trade secrets, trademarks, service marks, marketing and sales plans, sales forecasts, price lists, quoting and pricing techniques and strategies, budgets, customer characteristics, personnel files, compensation information, identity of purchasing personnel in the employ of Customers and prospective customers, amount or kind of goods and services purchased from the Company by its Customers, sources of consultants, information provided to the Company by Customers and any other proprietary information that is produced during, generated by, procured during or utilized in the operations of the Company or its Customers. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged at any time during employment, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company or any Customer. Notwithstanding the above, Confidential Information shall not include any information which is or becomes part of the public domain, except for information which became part of the public domain as a result of disclosure of such information by the Employee in violation of this Agreement or the wrongful disclosure of such information by a third party. Additionally, Confidential Information shall not include the refurbishment processes for Sumitomo cold heads. The Employee acknowledges that all Confidential Information is and shall remain the exclusive property of the Company or its Customers, as the case may be.

"**Company Materials**" shall mean the various writings, correspondence, notes, manuals, plans, drawings, designs, specifications, computer files, source code and other documents and records of the Company or Customers in which Confidential Information is contained, regardless of (i) the form of media in which it is contained, (ii) whether or not labeled or identified as "confidential," and (iii) whether or not prepared in full or in part by the Employee.

"**Customer**" shall mean any individual, corporation, trust, partnership, business or other entity (each a "**Person**") who is, or was at any time within the two (2) year period prior to termination of the Employee's employment with the Company, a customer of the Company.

"**Similar Business**" means a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications other work or business performed or contemplated by the Company from time to time.

6.3    **Protection of Confidential Information.**

(a)    Acknowledgments by Employee.    The Employee acknowledges that (i) during his employment with the Company, the Employee has been and will continue to be afforded access to Confidential Information; (ii) public disclosure of such Confidential Information is likely to have an adverse impact on the Company and its business; and (iii) the provisions of this Article 6 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b)    Nondisclosure and Nonuse of Confidential Information.    During his employment with the Company and at all times after the termination of the Employee's employment with the Company, the Employee (i) shall maintain all Confidential Information in strict confidence; (ii) shall not disclose any Confidential Information, directly or indirectly, to any third party except as required by the Employee's duties of employment with the Company or as permitted in advance by the Company in writing; (iii) shall not use any Confidential Information to the detriment of the Company and/or for the benefit of the Employee or any other third party; (iv) shall not authorize or permit any use or disclosure of Confidential Information by any other person or entity; and (v) shall comply with the policies and procedures of the Company regarding use and disclosure of Confidential Information.

(c)    Use and Return of Company Materials.    The Employee shall not copy any Company Materials except to the extent necessary in connection with the Employee's employment, nor remove any Company Materials or copies thereof from the premises of the Company except to the extent necessary for the Employee's employment and then only with the express authorization of the Company.  The Employee shall return to the Company all Company Materials and copies thereof in the Employee's possession or control immediately upon request of the Company at any time during or after the term of his employment with the Company.

(d)    Notification.    The Employee shall promptly advise the Company in writing upon learning of any unauthorized use or disclosure of Confidential Information. If the Employee is required or reasonably expects to be required to disclose the Confidential Information pursuant to an order of a court or regulatory agency, then the Employee shall, as soon as practicable prior to such disclosure, give the Company sufficient prior notice and reasonable assistance to contest or limit such order.

6.4    **Invention Protection.**

(a)    Work Made for Hire.    The Employee recognizes and understands that his duties at the Company may include the preparation of materials, and that any such materials conceived or written by him were done and shall continue to be done as "work made for hire" as defined and used in the Copyright Act of 1976, 17 USC 1 et seq.  In the event of publication of such materials, the Employee understands that since the work is a "work made for hire," the Company will solely retain and own all right, title and interest in and to all such materials, including the right to copyright.

(b)    Disclosure of Existing Discoveries, Ideas and Inventions.    The Employee represents that he does not have any right, title or interest in, nor has he made or

5

conceived wholly or in part prior to the Effective Date (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), any discovery, idea and/or invention, which is related to or could be used in the conduct of the Company's business.

(c)    Disclosure of other Discoveries, Ideas and Inventions/ Assignment of Patents.    The Employee shall disclose promptly to the Company, (i) any and all works, inventions, discoveries, ideas and/or improvements authored, conceived or made by the Employee during the period of his employment with the Company (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), whether developed solely by the Employee or jointly with others, which are related to the lines of business, work or investigation of the Company at the time of such work, and (ii) inventions, discoveries, ideas and/or improvements which result from, or are suggested by, any work which the Employee may do for or on behalf of the Company (the items described in subparagraphs 6.4(c)(i) and (c)(ii) are collectively referred to as "**Inventions**").    The Employee hereby assigns and agrees to assign all of her right, title and interest in and to all Inventions to the Company or its nominee.    Whenever requested to do so by the Company, the Employee shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country or to otherwise protect the interest of the Company in and to any Inventions and shall assist the Company in every proper way (entirely at the Company's expense, including reimbursement to the Employee for all expense and loss of income) to obtain such patents and copyrights and to enforce them.    The Employee's obligations pursuant to this Section 6.4(c) shall continue beyond the termination of his employment with respect to works, inventions, discoveries, ideas and improvements authored, conceived or made by the Employee during the period of his employment with the Company, and shall be binding upon the Employee's assigns, executors, administrators and other legal representatives.    All such Inventions shall remain the sole and exclusive property of the Company, whether patentable or not.

6.5    Covenant Not to Solicit Employees.    During his employment and for a period of one (1) year after the expiration or earlier termination of the employment, the Employee shall not, directly or indirectly, and will not assist, directly or indirectly, any other Person to: solicit, hire or engage in any capacity any employee or independent contractor of the Company (or any Person who was an employee or independent contractor of the Company within three (3) months prior to the date of the Employee's termination) or solicit or seek to persuade any employee or independent contractor of the Company to discontinue employment with the Company.

6.6    Covenant Not to Solicit Customers.    The Employee shall not, for a period of one (1) year after the effective date of the termination of Employee's employment with the Company, directly or indirectly contact, solicit or accept the business of any Customer.

6.7    Covenant Not to Compete.    Subject to Section 6.9, the Employee shall not, during his employment and for a period of one (1) year after the termination of the Employee's employment with the Company, alone or in conjunction with any other Person, whether as an employee, consultant, sole proprietor, partner, shareholder, officer, director, joint

venturer, investor or in any other capacity, directly or indirectly, engage in any Similar Business anywhere in the United States of America.

      6.8   **Exceptions to Non-Competition Covenant.** Notwithstanding anything in Section 6.8 to the contrary, the non-competition covenant set forth in Section 6.8 shall not apply to Employee following termination of employment (a) in the event that the Company fails to contribute an annual amount equal to or greater than the annual amount the Company is contributing as of the Effective Date for health care insurance benefits for Employee and Employee terminates employment with the Company within ten (10) days after becoming aware that the Company diminished its contribution towards Employee's health care insurance coverage, or (b) in the event that Employee's employment with the Company is terminated by the Company without Cause. Section 6.8 shall be binding upon the Employee following termination of employment for any other reason including, but not limited to, termination by Employee for any or no reason and termination by the Company for Cause. The covenants in Sections 6.6 and 6.7 shall remain binding regardless of which party terminates Employee's employment or whether such termination was for any or no reason (including Cause).

      6.9   **Miscellaneous.**

      (a)   Tolling. The time periods specified in Article 6 shall extend by the length of any time during which the Employee is in breach of any of the restrictive covenants contained herein.

      (b)   Notice of Employment. The Employee shall, while the covenants under this Article 6 are in effect, give notice to the Company, within ten (10) days after accepting employment with another employer, of the identity of the Employee's new employer. The Company may notify such employer that the Employee is bound by this Agreement and, at the Company's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

      (c)   Unique Agreement. The Employee agrees that each of the covenants set forth in this Article 6 are separate and distinct covenants, independent of each other, and that the illegality or invalidity of any one (1) or more of them or any part of one (1) or more of them shall not render the others illegal or invalid, and that if the invalidity or unenforceability of a covenant is due to the unreasonableness of the scope of activities or the time or geographical area covered by said covenant, said covenant shall nevertheless be enforced to the maximum extent permitted by law and effective for such scope of activities or period of time and for such area as may be determined to be reasonable by a court of competent jurisdiction. The Employee hereby consents and agrees that the scope of such covenants may be modified in any proceeding brought to enforce such covenants and restrictions.

      7.   **RELIEF.**

      7.1   **WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE COMPANY'S EMPLOYMENT OF THE EMPLOYEE.

8. **GENERAL AND MISCELLANEOUS PROVISIONS.**

8.1 **Amendments; Waiver.** No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

8.2 **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties pertaining to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties relating to such subject matter; provided that the Employee shall, in addition to this Agreement, be subject to the employment policies of the Company as in effect from time to time.

8.3 **Choice of Law.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, including, without limitation, the Pennsylvania Uniform Trade Secrets Act, and without giving effect to the conflict of law provisions. Employee consents to the personal jurisdiction of Pennsylvania courts located in Allegheny County, Pennsylvania for the purposes of interpreting and enforcing this Agreement, including the federal courts sitting in Pittsburgh, Pennsylvania, and those courts shall be the sole and exclusive venue for the parties with regard to any disputes that arise under or pursuant to this Agreement.

8.4 **Severability.** In the event that any one (1) or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason in any jurisdiction, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained in this Agreement shall not be in any way impaired thereby. It is in the mutual interest of Employee and the Company that all of the rights and privileges of the Parties hereto shall be enforceable to the fullest extent permitted by law.

8.5 **Counterparts; Facsimile Signatures.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one (1) and the same instrument. All signatures of the Parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

8.6 **Changes; Amendments.** No changes or amendments to this Agreement may be made without written agreement of both parties. This includes, but is not limited to, changes in compensation.

8.7 **Advice of Counsel; Interpretation, Headings.** THE PARTIES ACKNOWLEDGE AND AGREE THAT THEY HAVE CONSULTED WITH COUNSEL OR HAD AN ADEQUATE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THE TERMS SET FORTH HEREIN. THIS AGREEMENT REPRESENTS THE PRODUCT OF EXTENSIVE NEGOTIATIONS BY THE PARTIES, AND IT SHALL BE INTERPRETED ACCORDING TO ITS FAIR MEANING AND NOT FOR OR

AGAINST ANY PARTY.  THE SUBJECT HEADINGS OF THE ARTICLES, SECTIONS, PARAGRAPHS AND SUBPARAGRAPHS OF THIS AGREEMENT ARE INCLUDED FOR PURPOSES OF CONVENIENCE ONLY AND SHALL NOT AFFECT THE CONSTRUCTION OR INTERPRETATION OF ANY OF ITS PROVISIONS.

IN WITNESS WHEREOF, each of the Parties hereto has executed this Agreement as of the date first above written.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.]

[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]

**PITTSBURGH UNIVERSAL, LLC d/b/a
COOL PAIR PLUS,**

By:
Name:
Title:


**EMPLOYEE**

3/4/11

SEAN MYKLEBY

# EXHIBIT B



**METZ LEWIS BRODMAN MUST O'KEEFE LLC**

535 Smithfield Street, Suite 800, Pittsburgh, Pennsylvania 15222
t 412.918.1100  f 412.918.1199  www.metzlewis.com

September 6, 2016

**ATTORNEYS AT LAW**

KENNETH S. KORNACKI

**Via Certified Mail, Return Receipt Requested**
Mr. Sean Mykleby
2631 N. Bradford Drive
Arlington Heights, Illinois 60004

Re:   *Continuing Obligations to Cool Pair Plus*

Dear Mr. Mykleby:

This office represents Pittsburgh Universal, LLC d/b/a Cool Pair Plus ("Cool Pair"). Cool Pair received your written notice of resignation whereby you voluntarily resigned your position as Senior Cryogenic Technician effective September 6, 2016. This letter is to remind you that you signed an Employment Agreement ("Agreement") with Cool Pair effective March 4, 2011, under which you have continuing obligations to Cool Pair that survive the end of your employment. For your reference, a copy of the Agreement is enclosed with this letter.

The Agreement has a number of restrictive covenants that survive the end of your employment. First, the Agreement has a non-compete clause whereby you agreed, for a period of one year, not to work for a competitor of Cool Pair or otherwise engage in any Similar Business anywhere in the United States.[1] You also agreed, for a period of one year, not to solicit, contact, or accept business from any Cool Pair customer. Finally, you agreed, for a period of one year, not to solicit or hire any Cool Pair employees or persuade any Cool Pair employees to discontinue their employment with Cool Pair. You acknowledged that these covenants are reasonable and serve Cool Pair's legitimate business interest in protecting its ability to compete in the industry.

Under the Agreement, you also agreed that both during and after your employment you would: (1) not use or disclose any of Cool Pair's Confidential Information (as defined in the Agreement) for your personal benefit or the benefit of any subsequent employer or competitor of Cool Pair; and (2) return to the

---

[1] The Agreement defines "Similar Business" as a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications other work or business performed or contemplated by Cool Pair from time to time.

Mr. Sean Mykleby
September 6, 2016
Page Two

company all Confidential Information (whether in paper or electronic form) and other Cool Pair property (e.g., company issued computers, cell phones, keys, access cards). Your obligations concerning Cool Pair's Confidential Information are ongoing and remain indefinitely. I understand from your resignation letter that you are sending certain items to Cool Pair via Federal Express. If you have not yet returned all company property, please contact me immediately to arrange a date and time at which you will deliver all company property that is in your possession back to the company.

The Agreement requires you to inform Cool Pair of the identity of your new employer while the restrictive covenants are in place. Upon receipt of this letter, please contact me at (412) 918-1109 or by email at kkornacki@metzlewis.com to provide me with such information. Cool Pair expects you to inform any new employer about your continuing obligations, and expects that your new employer will respect these obligations and refrain from inducing you to breach them. Cool Pair also has the right under the Agreement to notify your new employer of your continuing obligations.

If Cool Pair suspects that you are breaching any of your continuing obligations under the Agreement, or that your new employer is inducing you to breach or otherwise violate your duties under the Agreement, Cool Pair will take any and all action necessary to enjoin the breach, and seek full compensation for all harm caused by the breach. I hope and expect that you will honor your contract. If you have any questions about the contents of this letter, please do not hesitate to contact me.

Very truly yours,

Kenneth S. Kornacki

Enclosure

cc:    Mr. James Balet (via email) (w/o enclosure)

# EXHIBIT C



**ATTORNEYS AT LAW**

KENNETH S. KORNACKI

**METZ LEWIS BRODMAN MUST O'KEEFE LLC**

535 Smithfield Street, Suite 800, Pittsburgh, Pennsylvania 15222
T 412.918.1100  F 412.918.1199  www.metzlewis.com

September 9, 2016

**Via Federal Express**
Mr. Sean Mykleby
2631 N. Bradford Drive
Arlington Heights, Illinois 60004

Re:   *Return of Cool Pair Plus Property*

Dear Mr. Mykleby:

This office represents Pittsburgh Universal, LLC d/b/a Cool Pair Plus ("Cool Pair"). In a letter dated September 6, 2016, I wrote to you to remind you of your continuing contractual obligations to Cool Pair following your resignation. It now appears that you have breached your agreement by taking Cool Pair property that contains confidential customer information. If you do not return all Cool Pair property in the next five (5) days, Cool Pair will take all steps necessary to recover its property and enforce its rights.

In your role as Senior Cryogenic Technician, you maintained multiple notebooks (believed to be no less than five) that contained detailed records of customer calls, price quotes, and contact information that spanned a period of years. These records are clearly Cool Pair property and constitute Confidential Information as defined in your Employment Agreement (the "Agreement"). Cool Pair kept these records at its Algonquin, Illinois office, and the records have been missing since you resigned.

Under the Agreement, you agreed that both during and after your employment you would: (1) not use or disclose any of Cool Pair's Confidential Information for your personal benefit or the benefit of any subsequent employer or competitor of Cool Pair; and (2) return all Company Materials (including Confidential Information) to Cool Pair without maintaining any copies of said materials. By retaining the referenced notebooks, you have violated numerous terms of your Agreement and have put Cool Pair's competitively sensitive information at risk.

Direct Dial: 412.918.1100                                    e-mail: kkornacki@metzlewis.com

Mr. Sean Mykleby
September 9, 2016
Page Two

This letter is a demand that you immediately (and in no event later than five days from the date of this letter) return to Cool Pair the notebooks containing Cool Pair's Confidential Information and any other Company Materials you may have unlawfully retained. You must not retain any copies of Cool Pair's Confidential Information. Cool Pair reserves all rights it has under the Agreement, including the right to file legal action in Pennsylvania (as required under the Agreement) and to recover all contractual and other remedies available under the law, including a claim for attorneys' fees under the Pennsylvania Uniform Trade Secrets Act.

Please contact me immediately to discuss this serious matter. Time is of the essence.

Very truly yours,

Kenneth S. Kornacki

cc:     Mr. James Balot (via email)

# EXHIBIT D

# BARNES&THORNBURGLLP

2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904 U.S.A.
(310) 284-3880
Fax (310) 284-3894

www.btlaw.com

September 16, 2016

**VIA OVERNIGHT MAIL**

Kenneth Kornacki, Esq.
Mertz Lewis Broadman Must O'Keefe LLC
535 Smithfield Street, Suite 800
Pittsburgh, PA 15222

      RE:    Sean Mykleby/Cool Air

Dear Mr. Kornacki:

    Our firm represents Sean Mykleby, and I am writing in response to your recent letters to Mr. Mykleby related to his former employer Pittsburgh Universal, LLC dba Cool Pair Plus ("Cool Pair").

    First, I am enclosing the notebooks that Cool Pair has asked to be returned. There are three notebooks in total, covering the periods from April 20, 2015 through November 3, 2015 and March 7, 2016 through April 19, 2016 (blue label); November 3, 2015 through March 1, 2016 (orange label); and April 21, 2016 through August 26, 2016 (blue label). While these notebooks do not contain any confidential or trade secret information, Mr. Mykleby is returning them as requested.

    Second, in accordance with your request, please be advised that Mr. Mykleby is working for a company named ThermoMagnetics & Cryogens, Inc., located at 1290 East Elm Street, Ontario, California 91761.

Sincerely yours,

Gloria C. Jan

Encls.

Atlanta    Chicago    Delaware    Indiana    Los Angeles    Michigan    Minneapolis    Ohio    Washington, D.C.

# EXHIBIT E

## METZ LEWIS BRODMAN MUST O'KEEFE LLC

535 Smithfield Street  Suite 800  Pittsburgh, Pennsylvania 15222
T:412.918.1100  F:412.918.1199  www.metzlewis.com

September 28, 2016





ATTORNEYS AT LAW

KENNETH S. KORNACKI

**Via Federal Express**
ThermoMagnetics & Cryogens, Inc.
1290 East Elm Street
Ontario, CA 91761

       Re:    *Mr. Sean Mykleby - Non-Competition Agreement with Cool Pair*
                 *Plus*

Dear Sir or Madam:

      This office represents Pittsburgh Universal, LLC d/b/a Cool Pair Plus ("Cool Pair"). I am writing concerning ThermoMagnetics & Cryogens, Inc.'s ("TMC") employment of Mr. Sean Mykleby. Please direct all future correspondence regarding these matters to my attention.

      Mr. Mykleby formerly served as Cool Pair's Senior Cryogenic Technician until he resigned his position effective September 6, 2016. While employed at Cool Pair, Mr. Mykleby signed a March 4, 2011 Employment Agreement (the "Agreement") that contains a non-disclosure provision, Covenant Not to Compete, and Covenant Not to Solicit that survive the end of his employment. I enclose a copy of the Agreement for your immediate review.

      The Agreement has a number of restrictive covenants that bind Mr. Mykleby. First, the Agreement has a non-compete clause whereby Mr. Mykleby agreed, for a period of one year, not to work for a competitor of Cool Pair or otherwise engage in any Similar Business anywhere in the United States.[1] Mr. Mykleby also agreed, for a period of one year, not to solicit, contact, or accept business from any Cool Pair customer, or to solicit, hire or persuade any Cool Pair employees to discontinue their employment with Cool Pair. The Protection of Confidential Information provision prohibits Mr. Mykleby from using or disclosing Cool Pair's Confidential Information, including among other things its customer lists, processes, and pricing information. Mr. Mykleby acknowledged

---

[1] The Agreement defines "Similar Business" as a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications or other work or business performed or contemplated by Cool Pair from time to time.

Direct Dial: 412.918.1109                          e-mail: kkornacki@metzlewis.com

ThermoMagnetics & Cryogens, Inc.
September 28, 2016
Page 2

that these covenants are reasonable and serve Cool Pair's legitimate business interest in protecting its ability to compete in the industry.

Cool Pair has serious concerns that TMC's employment of Mr. Mykleby is causing him to violate his Agreement with Cool Pair, and that TMC is tortiously interfering with Cool Pair's rights under the Agreement. Although I was not able to find a TMC website that describes its business, there are several indicators that TMC is in fact a "Similar Business" (as defined in the Agreement) for which Mr. Mykleby is prohibited from accepting employment. Mr. Mykleby's LinkedIn account identifies him as TMC's President who is responsible for product support, quality assurance, and research and development in the "cryogenic marketplace," which is the precise industry in which Cool Pair operates. Moreover, TMC's company address is the same as SouthWest Medical Resources, a Cool Pair competitor in the magnet service and cryogen services industry. SouthWest's president, Mr. Don McCormack, told Cool Pair's Jim Balet that his son (Mike McCormack) was starting a cold head repair business using the equipment and assets they purchased from another defunct competitor, bc technical. Cool Pair has reason to believe that TMC is this new, competing business. If so, TMC would be tortiously interfering with Cool Pair's Agreement with Mr. Mykleby by employing him in violation of his non-compete.

Cool Pair hereby requests that TMC either terminate its relationship with Mr. Mykleby or provide Cool Pair with appropriate evidence that Sean Mykleby's employment with TMC does not constitute a violation of Mr. Mykleby's post-employment obligations under the Agreement. If you do not respond to these requests, Cool Pair will assume that TMC is intentionally and unlawfully interfering with Cool Pair's Agreement with Mr. Mykleby. In that event, Cool Pair will be forced to commence legal action to enforce its rights, will request immediate entry of an injunction, and will seek reimbursement of any and all damages incurred by Cool Pair as a result of TMC's actions.

To avoid litigation, Cool Pair must receive from you immediately, but in no event later than by 5:00 p.m. Monday, October 3, 2016, a written acknowledgement that TMC has ended its relationship with Mr. Mykleby or sufficient evidence that TMC is not a Similar Business as defined by the Agreement.

Thank you for your prompt attention to this matter.

Very truly yours,

Kenneth S. Kornacki

Enclosure
cc:   Mr. James Balet (via email)
      Gloria C. Jan, Esq. (via email)

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") is effective this _MARCH 4, 2011_____ (the "**Effective Date**"), by and between PITTSBURGH UNIVERSAL, LLC d/b/a COOL PAIR PLUS, a Pennsylvania limited liability company (hereinafter, the "**Company**"), and Sean Mykleby , residing at _511 E MACKBERRY Or A.H. Is 60004_ (hereinafter, the "**Employee**"). The Company and the Employee are sometimes each referred to herein as a "**Party**" and collectively as the "**Parties**."

### W I T N E S S E T H:

WHEREAS, the Company is engaged in the business of providing repair, refurbishment, installation and support services for cryogenic refrigeration equipment, coldheads, compressors, flexlines, absorbers and other related parts for MRI systems, industrial vacuum pumps and other research applications; and

WHEREAS, the Employee recognizes that the Company has a legitimate business interest in protecting its proprietary, secret and confidential information and acknowledges the need of the Company to impose certain restrictions upon the Employee in order to safeguard its ability to effectively compete in its industry during, and for a reasonable period after the natural expiration or earlier termination of, the term of the Employee's employment with the Company;

WHEREAS, Employee has been working for Employer since _AUGUST_, 2010, with the understanding and acknowledgement that this Agreement would be executed at a later date, but that this Agreement would be effective as of the Effective Date,

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.    EMPLOYMENT.  The Company employs the Employee as a Sr. Cryogenic Technician, and the Employee has accepted such employment. The Employee agrees to perform his duties and the responsibilities provided for herein in accordance with the terms and conditions of this Agreement. The Employee acknowledges and agrees that the Company may change his title and his duties from time to time as the interests of the Company require, as determined in the sole and exclusive discretion of the Company.

2.    AT WILL EMPLOYMENT.  Employee acknowledges and agrees that his employment with Company is and always shall be "at-will". Employee also acknowledges and agrees that Company may, within it sole discretion, amend or change from time to time any employment practices, policies or procedures not expressly governed by the terms of this Agreement. Employee's employment pursuant to the terms of this Agreement shall commence on the Effective Date written above and shall continue until Employee's employment is terminated by the Employee or the Company.

3.    RESPONSIBILITIES.

3.1    Duties.  At all times during the term of his employment with the Company, the Employee shall perform such duties as shall reasonably be assigned by the Company from

time to time.  These duties will include but are not limited to conducting field service for MRI magnet maintenance (including cold head, compressor and flexline repair and replacement, cryogen filling and other magnet maintenance), in-house repairs to cryogenic cooling components (oil absorbers, flexlines, compressors and cold heads).

3.2    **Duty of Loyalty**.  At all times during the term of this Agreement, the Employee shall devote his full working time, energy and skills to the performance of services for the Company hereunder and shall refrain from engaging in any other work or business activity which interferes with the Employee's performance of his duties hereunder.  This covenant is in addition to, and shall not be construed in any manner as limiting, the Employee's other covenants contained within this Agreement.

4.    **COMPENSATION AND BENEFITS**.

4.1    **Base Salary and Initial Bonus Payment**.  The Employee shall receive an initial base salary of $100,000 per year, payable in accordance with the standard payroll practices of the Company.  Increases to base salary, if any, shall be at the discretion of the Company.  In addition, as an incentive to execute this Agreement after the Effective Date, Employee will receive a one time payment of $1,000.  Employee acknowledges and agrees that this one time payment is additional consideration for the Employee's agreement to be bound by the restrictive covenants contained in Article 6, that the Company would not employ the Employee after the Effective Date without Employee's agreement to be bound by the restrictive covenants made by Employee in Article 6 and the consideration provided by the Company to the Employee pursuant to this Agreement is sufficient and adequate consideration for Employee's agreement to be bound by the terms of this Agreement including, without limitation, the restrictive covenants made by Employee in Article 6.

4.2    **Cold Head Repair Bonus**.  The Employee shall also receive, in addition to his Bas Salary, a bonus payment of $525 for each Sumitomo model cold head that is successfully repaired and performs for 12 months without a verified customer warranty claim.  This bonus is payable monthly based on the previous month's cold head shipments.  Annual adjustments to the per-cold head bonus amount may be completed based on a target of 10% of the cold head selling price.

4.3    **Employee Benefits**.  The Employee shall be entitled to participate, to the extent he is eligible under the terms and conditions thereof, in any hospitalization or medical insurance plans, disability insurance plans, life insurance plans, retirement or other employee or fringe benefit plans maintained by the Company, all in accordance with the applicable policies of the Company.  The Company shall be under no obligation to institute or continue the existence of any employee benefit plan and may from time to time amend, modify or terminate any such plan.  The Employee shall be entitled to annual paid time off in accordance with the written policies of the Company.

4.4    **Withholding**.  All payments made by the Company under this Agreement will be reduced by any tax or other amounts legally required to be withheld by the Company under applicable law.

4.5   **Survival.** Provisions of this Agreement will survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, Section 3.2 and Articles 6 and 7 of this Agreement (each of which shall survive termination of this Agreement). Upon termination of the Employee's employment with the Company by either the Employee or the Company, all rights, duties and obligations of the Company to the Employee will cease, except as otherwise expressly provided in this Agreement.

4.6   **Severance.** In the event employment is terminated by the Company without cause, the Employee will be eligible for a severance payment equal to his previous year's W-2 earnings, payable in 12 monthly installments.

5.   **ASSIGNMENT.** The Employee shall not assign this Agreement without the prior written consent of the Company. The Company may assign this Agreement and the Employee hereby consents to any such assignment. This Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective heirs, legal representatives, successors and permitted assigns.

6.   **CERTAIN COVENANTS, REPRESENTATIONS AND WARRANTIES BY THE EMPLOYEE.**

6.1   **Restrictive Covenants.** This Agreement contains restrictive covenants made by the Employee. The Employee acknowledges that certain of the Company's personnel, methods of operation, business relationships, products and services are highly specialized and that the Confidential Information (as hereinafter defined) to which the Employee will have access is not generally known in the Company's industry. The Employee further acknowledges that the Company has a legitimate interest in protecting its ability to effectively compete in its industry and that it is reasonably necessary for the protection of the Company's business interests for the Employee to agree to the restrictive covenants set forth in this Agreement.

6.2   **Certain Definitions.** For purposes of this Agreement the following capitalized terms shall have the meanings ascribed to them below:

"**Cause**" shall mean any of the following:

(a)   Any omission, act or conduct on Employee's part that amounts to gross negligence or willful misconduct to the detriment of the Company or that has materially injured the business or reputation of the Company or that has otherwise materially and adversely affected the interest of the Company or that might so materially injure the business and reputation of the Company or so affect its interest if Employee were retained as an employee including, but not limited to, acts of violence, dishonesty, embezzlement, fraud, misappropriation, conviction of a crime (other than a summary offense), substance abuse or a plea of nolo contendere with respect to any of these actions;

(b)   Willfully destroying Employer's property.

"**Confidential Information**" shall mean all oral, written or other confidential and proprietary information or ideas in any form, tangible or intangible, of or

3

relating to the Company or its business including, but not limited to, information pertaining in any manner to the business or affairs, financial or otherwise, of the Company or any of its employees, Customers, consultants or business associates. Confidential Information includes, without limitation: designs, inventions, innovations, patents, patent applications, discoveries, improvements, specifications, data, know-how, formats, test results, documentation, components, business and product plans, contracts and agreements, service offerings, specifications, financial information, customer lists, supplier lists, formulas, research techniques, research results, trade secrets, trademarks, service marks, marketing and sales plans, sales forecasts, price lists, quoting and pricing techniques and strategies, budgets, customer characteristics, personnel files, compensation information, identity of purchasing personnel in the employ of Customers and prospective customers, amount or kind of goods and services purchased from the Company by its Customers, sources of consultants, information provided to the Company by Customers and any other proprietary information that is produced during, generated by, procured during or utilized in the operations of the Company or its Customers. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged at any time during employment, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company or any Customer. Notwithstanding the above, Confidential Information shall not include any information which is or becomes part of the public domain, except for information which became part of the public domain as a result of disclosure of such information by the Employee in violation of this Agreement or the wrongful disclosure of such information by a third party. Additionally, Confidential Information shall not include the refurbishment processes for Sumitomo cold heads. The Employee acknowledges that all Confidential Information is and shall remain the exclusive property of the Company or its Customers, as the case may be.

"**Company Materials**" shall mean the various writings, correspondence, notes, manuals, plans, drawings, designs, specifications, computer files, source code and other documents and records of the Company or Customers in which Confidential Information is contained, regardless of (i) the form of media in which it is contained, (ii) whether or not labeled or identified as "confidential," and (iii) whether or not prepared in full or in part by the Employee.

"**Customer**" shall mean any individual, corporation, trust, partnership, business or other entity (each a "**Person**") who is, or was at any time within the two (2) year period prior to termination of the Employee's employment with the Company, a customer of the Company.

"**Similar Business**" means a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications other work or business performed or contemplated by the Company from time to time.

6.3    **Protection of Confidential Information.**

(a)    Acknowledgments by Employee. The Employee acknowledges that (i) during his employment with the Company, the Employee has been and will continue to be afforded access to Confidential Information; (ii) public disclosure of such Confidential Information is likely to have an adverse impact on the Company and its business; and (iii) the provisions of this Article 6 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b)    Nondisclosure and Nonuse of Confidential Information. During his employment with the Company and at all times after the termination of the Employee's employment with the Company, the Employee (i) shall maintain all Confidential Information in strict confidence; (ii) shall not disclose any Confidential Information, directly or indirectly, to any third party except as required by the Employee's duties of employment with the Company or as permitted in advance by the Company in writing; (iii) shall not use any Confidential Information to the detriment of the Company and/or for the benefit of the Employee or any other third party; (iv) shall not authorize or permit any use or disclosure of Confidential Information by any other person or entity; and (v) shall comply with the policies and procedures of the Company regarding use and disclosure of Confidential Information.

(c)    Use and Return of Company Materials. The Employee shall not copy any Company Materials except to the extent necessary in connection with the Employee's employment, nor remove any Company Materials or copies thereof from the premises of the Company except to the extent necessary for the Employee's employment and then only with the express authorization of the Company. The Employee shall return to the Company all Company Materials and copies thereof in the Employee's possession or control immediately upon request of the Company at any time during or after the term of his employment with the Company.

(d)    Notification. The Employee shall promptly advise the Company in writing upon learning of any unauthorized use or disclosure of Confidential Information. If the Employee is required or reasonably expects to be required to disclose the Confidential Information pursuant to an order of a court or regulatory agency, then the Employee shall, as soon as practicable prior to such disclosure, give the Company sufficient prior notice and reasonable assistance to contest or limit such order.

6.4    **Invention Protection.**

(a)    Work Made for Hire. The Employee recognizes and understands that his duties at the Company may include the preparation of materials, and that any such materials conceived or written by him were done and shall continue to be done as "work made for hire" as defined and used in the Copyright Act of 1976, 17 USC 1 et seq. In the event of publication of such materials, the Employee understands that since the work is a "work made for hire," the Company will solely retain and own all right, title and interest in and to all such materials, including the right to copyright.

(b)    Disclosure of Existing Discoveries, Ideas and Inventions. The Employee represents that he does not have any right, title or interest in, nor has he made or

5

conceived wholly or in part prior to the Effective Date (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), any discovery, idea and/or invention, which is related to or could be used in the conduct of the Company's business.

(c)     Disclosure of other Discoveries, Ideas and Inventions/ Assignment of Patents.  The Employee shall disclose promptly to the Company, (i) any and all works, inventions, discoveries, ideas and/or improvements authored, conceived or made by the Employee during the period of his employment with the Company (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), whether developed solely by the Employee or jointly with others, which are related to the lines of business, work or investigation of the Company at the time of such work, and (ii) inventions, discoveries, ideas and/or improvements which result from, or are suggested by, any work which the Employee may do for or on behalf of the Company (the items described in subparagraphs 6.4(c)(i) and (c)(ii) are collectively referred to as "**Inventions**").  The Employee hereby assigns and agrees to assign all of her right, title and interest in and to all Inventions to the Company or its nominee.  Whenever requested to do so by the Company, the Employee shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country or to otherwise protect the interest of the Company in and to any Inventions and shall assist the Company in every proper way (entirely at the Company's expense, including reimbursement to the Employee for all expense and loss of income) to obtain such patents and copyrights and to enforce them.  The Employee's obligations pursuant to this Section 6.4(c) shall continue beyond the termination of his employment with respect to works, inventions, discoveries, ideas and improvements authored, conceived or made by the Employee during the period of his employment with the Company, and shall be binding upon the Employee's assigns, executors, administrators and other legal representatives.  All such Inventions shall remain the sole and exclusive property of the Company, whether patentable or not.

6.5     Covenant Not to Solicit Employees.  During his employment and for a period of one (1) year after the expiration or earlier termination of the employment, the Employee shall not, directly or indirectly, and will not assist, directly or indirectly, any other Person to: solicit, hire or engage in any capacity any employee or independent contractor of the Company (or any Person who was an employee or independent contractor of the Company within three (3) months prior to the date of the Employee's termination) or solicit or seek to persuade any employee or independent contractor of the Company to discontinue employment with the Company.

6.6     Covenant Not to Solicit Customers.  The Employee shall not, for a period of one (1) year after the effective date of the termination of Employee's employment with the Company, directly or indirectly contact, solicit or accept the business of any Customer.

6.7     Covenant Not to Compete.  Subject to Section 6.9, the Employee shall not, during his employment and for a period of one (1) year after the termination of the Employee's employment with the Company, alone or in conjunction with any other Person, whether as an employee, consultant, sole proprietor, partner, shareholder, officer, director, joint

venturer, investor or in any other capacity, directly or indirectly, engage in any Similar Business anywhere in the United States of America.

      6.8     **Exceptions to Non-Competition Covenant.** Notwithstanding anything in Section 6.8 to the contrary, the non-competition covenant set forth in Section 6.8 shall not apply to Employee following termination of employment (a) in the event that the Company fails to contribute an annual amount equal to or greater than the annual amount the Company is contributing as of the Effective Date for health care insurance benefits for Employee and Employee terminates employment with the Company within ten (10) days after becoming aware that the Company diminished its contribution towards Employee's health care insurance coverage, or (b) in the event that Employee's employment with the Company is terminated by the Company without Cause. Section 6.8 shall be binding upon the Employee following termination of employment for any other reason including, but not limited to, termination by Employee for any or no reason and termination by the Company for Cause. The covenants in Sections 6.6 and 6.7 shall remain binding regardless of which party terminates Employee's employment or whether such termination was for any or no reason (including Cause).

      6.9     **Miscellaneous.**

      (a)     **Tolling.** The time periods specified in Article 6 shall extend by the length of any time during which the Employee is in breach of any of the restrictive covenants contained herein.

      (b)     **Notice of Employment.** The Employee shall, while the covenants under this Article 6 are in effect, give notice to the Company, within ten (10) days after accepting employment with another employer, of the identity of the Employee's new employer. The Company may notify such employer that the Employee is bound by this Agreement and, at the Company's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

      (c)     **Unique Agreement.** The Employee agrees that each of the covenants set forth in this Article 6 are separate and distinct covenants, independent of each other, and that the illegality or invalidity of any one (1) or more of them or any part of one (1) or more of them shall not render the others illegal or invalid, and that if the invalidity or unenforceability of a covenant is due to the unreasonableness of the scope of activities or the time or geographical area covered by said covenant, said covenant shall nevertheless be enforced to the maximum extent permitted by law and effective for such scope of activities or period of time and for such area as may be determined to be reasonable by a court of competent jurisdiction. The Employee hereby consents and agrees that the scope of such covenants may be modified in any proceeding brought to enforce such covenants and restrictions.

    7.     **RELIEF.**

      7.1     **WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE COMPANY'S EMPLOYMENT OF THE EMPLOYEE.

8.    **GENERAL AND MISCELLANEOUS PROVISIONS.**

8.1    **Amendments; Waiver.**  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

8.2    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties pertaining to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties relating to such subject matter; provided that the Employee shall, in addition to this Agreement, be subject to the employment policies of the Company as in effect from time to time.

8.3    **Choice of Law.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, including, without limitation, the Pennsylvania Uniform Trade Secrets Act, and without giving effect to the conflict of law provisions.  Employee consents to the personal jurisdiction of Pennsylvania courts located in Allegheny County, Pennsylvania for the purposes of interpreting and enforcing this Agreement, including the federal courts sitting in Pittsburgh, Pennsylvania, and those courts shall be the sole and exclusive venue for the parties with regard to any disputes that arise under or pursuant to this Agreement.

8.4    **Severability.**  In the event that any one (1) or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason in any jurisdiction, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained in this Agreement shall not be in any way impaired thereby.  It is in the mutual interest of Employee and the Company that all of the rights and privileges of the Parties hereto shall be enforceable to the fullest extent permitted by law.

8.5    **Counterparts; Facsimile Signatures.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one (1) and the same instrument.  All signatures of the Parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

8.6    **Changes; Amendments.**  No changes or amendments to this Agreement may be made without written agreement of both parties.  This includes, but is not limited to, changes in compensation.

8.7    **Advice of Counsel; Interpretation, Headings.**  THE PARTIES ACKNOWLEDGE AND AGREE THAT THEY HAVE CONSULTED WITH COUNSEL OR HAD AN ADEQUATE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THE TERMS SET FORTH HEREIN. THIS AGREEMENT REPRESENTS THE PRODUCT OF EXTENSIVE NEGOTIATIONS BY THE PARTIES, AND IT SHALL BE INTERPRETED ACCORDING TO ITS FAIR MEANING AND NOT FOR OR

8

AGAINST ANY PARTY.  THE SUBJECT HEADINGS OF THE ARTICLES, SECTIONS, PARAGRAPHS AND SUBPARAGRAPHS OF THIS AGREEMENT ARE INCLUDED FOR PURPOSES OF CONVENIENCE ONLY AND SHALL NOT AFFECT THE CONSTRUCTION OR INTERPRETATION OF ANY OF ITS PROVISIONS.

IN WITNESS WHEREOF, each of the Parties hereto has executed this Agreement as of the date first above written.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE FOLLOWS.]

[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]

**PITTSBURGH UNIVERSAL, LLC d/b/a**
**COOL PAIR PLUS,**

By: _____

Name:

Title:

**EMPLOYEE**

3/4/11

SEAN MYKLEBY

# EXHIBIT F



**METZ LEWIS BRODMAN MUST O'KEEFE LLC**

535 Smithfield Street  Suite 800  Pittsburgh, Pennsylvania 15222
T:412.918.1100  F:412.918.1199  www.metzlewis.com

September 28, 2016

**ATTORNEYS AT LAW**

KENNETH S. KORNACKI

<u>Via Email and Federal Express</u>
Gloria C. Jan, Esquire
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904

Re:  *Mr. Sean Mykleby - Non-Competition Agreement with Cool Pair Plus*

Dear Ms. Jan:

As you know from prior correspondence, this office represents Pittsburgh Universal, LLC d/b/a Cool Pair Plus ("Cool Pair"). I understand from your letter to me dated September 16, 2016, that you represent Mr. Sean Mykleby. I left you a voicemail on September 26 stating I wanted to discuss the matters outlined below, but you have not returned my call.

When Mr. Mykleby resigned his position as Cool Pair's Senior Cryogenic Technician, Cool Pair sent him a letter dated September 6, 2016 (copy enclosed) that reminded Mr. Mykleby of his post-employment obligations to Cool Pair under the parties' March 4, 2011 Employment Agreement (the "Agreement"). Under the Agreement, Mr. Mykleby is bound by a non-disclosure provision, a Covenant Not to Compete that prohibits him from accepting employment with a competitor of Cool Pair or otherwise engage in any Similar Business anywhere in the United States for a period of one year,[1] and a Covenant Not to Solicit Cool Pair's customer and employees, all of which survive the end of his employment.

In your letter, you advised me that Mr. Mykleby is working for ThermoMagnetics & Cryogens, Inc. ("TMC") following his resignation from Cool Pair. Cool Pair has serious concerns that Mr. Mykleby's employment with TMC is in violation of the Covenant Not to Compete in his Agreement. Although I was not able to find a TMC website that describes its business, there are several indicators that TMC is in fact a "Similar Business" (as defined in the Agreement) for which Mr. Mykleby is prohibited from accepting employment. Mr.

---

[1] The Agreement defines "Similar Business" as a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications or other work or business performed or contemplated by Cool Pair from time to time.

Direct Dial: 412.918.1109                                   e-mail: kkornacki@metzlewis.com

Gloria C. Jan, Esquire
September 28, 2016
Page 2

Mykleby's LinkedIn account identifies him as TMC's President who is responsible for product support, quality assurance, and research and development in the "cryogenic marketplace," which is the precise industry in which Cool Pair operates. TMC's name itself indicates that TMC is a competitor of Cool Pair in the cryogen services industry. Moreover, TMC's company address is the same as SouthWest Medical Resources, a Cool Pair competitor in the magnet service and cryogen services industry. SouthWest's president, Mr. Don McCormack, told Cool Pair's Jim Balet that his son (Mike McCormack) was starting a cold head repair business using the equipment and assets they purchased from another defunct competitor, bc technical. Cool Pair has reason to believe that TMC is this new, competing business. If so, Mr. Mykleby's employment with TMC is a direct breach of his Covenant Not to Compete.

Cool Pair hereby requests that Mr. Mykleby either immediately terminate his relationship with TMC or provide Cool Pair with appropriate evidence that his employment with TMC does not constitute a violation of his post-employment obligations under the Agreement. If you do not respond to these requests, Cool Pair will assume that Mr. Mykleby is violating his Agreement and that TMC is intentionally and unlawfully interfering with Cool Pair's Agreement with Mr. Mykleby. In that event, Cool Pair will be forced to commence legal action to enforce its rights, will request immediate entry of an injunction, and will seek reimbursement of any and all damages incurred by Cool Pair as a result of Mr. Mykleby's and TMC's actions.

To avoid litigation, Cool Pair must receive from you immediately, but in no event later than by 5:00 p.m. Monday, October 3, 2016, a written acknowledgement that Mr. Mykleby has ended his relationship with TMC or sufficient evidence that TMC is not a Similar Business as defined by the Agreement.

Thank you for your prompt attention to this matter.

Very truly yours,

Kenneth S. Kornacki

Enclosure

cc:   Mr. James Balet (via email)

## METZ LEWIS BRODMAN MUST O'KEEFE LLC

535 Smithfield Street  Suite 800  Pittsburgh, Pennsylvania 15222
T:412.918.1100  F:412.918.1199  www.metzlewis.com

September 6, 2016



**ATTORNEYS AT LAW**

KENNETH S. KORNACKI

**Via Certified Mail, Return Receipt Requested**
Mr. Sean Mykleby
2631 N. Bradford Drive
Arlington Heights, Illinois 60004

    Re:   *Continuing Obligations to Cool Pair Plus*

Dear Mr. Mykleby:

This office represents Pittsburgh Universal, LLC d/b/a Cool Pair Plus ("Cool Pair"). Cool Pair received your written notice of resignation whereby you voluntarily resigned your position as Senior Cryogenic Technician effective September 6, 2016. This letter is to remind you that you signed an Employment Agreement ("Agreement") with Cool Pair effective March 4, 2011, under which you have continuing obligations to Cool Pair that survive the end of your employment. For your reference, a copy of the Agreement is enclosed with this letter.

The Agreement has a number of restrictive covenants that survive the end of your employment. First, the Agreement has a non-compete clause whereby you agreed, for a period of one year, not to work for a competitor of Cool Pair or otherwise engage in any Similar Business anywhere in the United States.[1] You also agreed, for a period of one year, not to solicit, contact, or accept business from any Cool Pair customer. Finally, you agreed, for a period of one year, not to solicit or hire any Cool Pair employees or persuade any Cool Pair employees to discontinue their employment with Cool Pair. You acknowledged that these covenants are reasonable and serve Cool Pair's legitimate business interest in protecting its ability to compete in the industry.

Under the Agreement, you also agreed that both during and after your employment you would: (1) not use or disclose any of Cool Pair's Confidential Information (as defined in the Agreement) for your personal benefit or the benefit of any subsequent employer or competitor of Cool Pair; and (2) return to the

---

[1] The Agreement defines "Similar Business" as a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications other work or business performed or contemplated by Cool Pair from time to time.

Direct Dial: 412.918.1109                 e-mail: kkornacki@metzlewis.com

Mr. Sean Mykleby
September 6, 2016
Page Two

company all Confidential Information (whether in paper or electronic form) and other Cool Pair property (*e.g.*, company issued computers, cell phones, keys, access cards). Your obligations concerning Cool Pair's Confidential Information are ongoing and remain indefinitely. I understand from your resignation letter that you are sending certain items to Cool Pair via Federal Express. If you have not yet returned all company property, please contact me immediately to arrange a date and time at which you will deliver all company property that is in your possession back to the company.

The Agreement requires you to inform Cool Pair of the identity of your new employer while the restrictive covenants are in place. Upon receipt of this letter, please contact me at (412) 918-1109 or by email at kkornacki@metzlewis.com to provide me with such information. Cool Pair expects you to inform any new employer about your continuing obligations, and expects that your new employer will respect these obligations and refrain from inducing you to breach them. Cool Pair also has the right under the Agreement to notify your new employer of your continuing obligations.

If Cool Pair suspects that you are breaching any of your continuing obligations under the Agreement, or that your new employer is inducing you to breach or otherwise violate your duties under the Agreement, Cool Pair will take any and all action necessary to enjoin the breach, and seek full compensation for all harm caused by the breach. I hope and expect that you will honor your contract. If you have any questions about the contents of this letter, please do not hesitate to contact me.

Very truly yours,

Kenneth S. Kornacki

Enclosure

cc:   Mr. James Balet (via email) (w/o enclosure)

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is effective this _MARCH 4, 2011_ (the "Effective Date"), by and between **PITTSBURGH UNIVERSAL, LLC** d/b/a **COOL PAIR PLUS**, a Pennsylvania limited liability company (hereinafter, the "Company"), and Sean Mykleby, residing at _511 E. HACKBERRY Dr._ _A.H., IL 60004_ (hereinafter, the "Employee"). The Company and the Employee are sometimes each referred to herein as a "Party" and collectively as the "Parties."

### WITNESSETH:

**WHEREAS**, the Company is engaged in the business of providing repair, refurbishment, installation and support services for cryogenic refrigeration equipment, coldheads, compressors, flexlines, absorbers and other related parts for MRI systems, industrial vacuum pumps and other research applications; and

**WHEREAS**, the Employee recognizes that the Company has a legitimate business interest in protecting its proprietary, secret and confidential information and acknowledges the need of the Company to impose certain restrictions upon the Employee in order to safeguard its ability to effectively compete in its industry during, and for a reasonable period after the natural expiration or earlier termination of, the term of the Employee's employment with the Company;

**WHEREAS**, Employee has been working for Employer since _August_, 2010, with the understanding and acknowledgement that this Agreement would be executed at a later date, but that this Agreement would be effective as of the Effective Date,

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions herein contained, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.  **EMPLOYMENT.** The Company employs the Employee as a Sr. Cryogenic Technician, and the Employee has accepted such employment. The Employee agrees to perform his duties and the responsibilities provided for herein in accordance with the terms and conditions of this Agreement. The Employee acknowledges and agrees that the Company may change his title and his duties from time to time as the interests of the Company require, as determined in the sole and exclusive discretion of the Company.

2.  **AT WILL EMPLOYMENT.** Employee acknowledges and agrees that his employment with Company is and always shall be "at-will". Employee also acknowledges and agrees that Company may, within it sole discretion, amend or change from time to time any employment practices, policies or procedures not expressly governed by the terms of this Agreement. Employee's employment pursuant to the terms of this Agreement shall commence on the Effective Date written above and shall continue until Employee's employment is terminated by the Employee or the Company.

3.  **RESPONSIBILITIES.**

    3.1   **Duties.** At all times during the term of his employment with the Company, the Employee shall perform such duties as shall reasonably be assigned by the Company from

time to time.  These duties will include but are not limited to conducting field service for MRI magnet maintenance (including cold head, compressor and flexline repair and replacement, cryogen filling and other magnet maintenance), in-house repairs to cryogenic cooling components (oil absorbers, flexlines, compressors and cold heads).

3.2   **Duty of Loyalty**.  At all times during the term of this Agreement, the Employee shall devote his full working time, energy and skills to the performance of services for the Company hereunder and shall refrain from engaging in any other work or business activity which interferes with the Employee's performance of his duties hereunder.  This covenant is in addition to, and shall not be construed in any manner as limiting, the Employee's other covenants contained within this Agreement.

4.   **COMPENSATION AND BENEFITS.**

4.1   **Base Salary and Initial Bonus Payment**.  The Employee shall receive an initial base salary of $100,000 per year, payable in accordance with the standard payroll practices of the Company.  Increases to base salary, if any, shall be at the discretion of the Company.  In addition, as an incentive to execute this Agreement after the Effective Date, Employee will receive a one time payment of $1,000.  Employee acknowledges and agrees that this one time payment is additional consideration for the Employee's agreement to be bound by the restrictive covenants contained in Article 6, that the Company would not employ the Employee after the Effective Date without Employee's agreement to be bound by the restrictive covenants made by Employee in Article 6 and the consideration provided by the Company to the Employee pursuant to this Agreement is sufficient and adequate consideration for Employee's agreement to be bound by the terms of this Agreement including, without limitation, the restrictive covenants made by Employee in Article 6.

4.2   **Cold Head Repair Bonus**.  The Employee shall also receive, in addition to his Bas Salary, a bonus payment of $525 for each Sumitomo model cold head that is successfully repaired and performs for 12 months without a verified customer warranty claim.  This bonus is payable monthly based on the previous month's cold head shipments.  Annual adjustments to the per-cold head bonus amount may be completed based on a target of 10% of the cold head selling price.

4.3   **Employee Benefits**.  The Employee shall be entitled to participate, to the extent he is eligible under the terms and conditions thereof, in any hospitalization or medical insurance plans, disability insurance plans, life insurance plans, retirement or other employee or fringe benefit plans maintained by the Company, all in accordance with the applicable policies of the Company.  The Company shall be under no obligation to institute or continue the existence of any employee benefit plan and may from time to time amend, modify or terminate any such plan.  The Employee shall be entitled to annual paid time off in accordance with the written policies of the Company.

4.4   **Withholding**.  All payments made by the Company under this Agreement will be reduced by any tax or other amounts legally required to be withheld by the Company under applicable law.

4.5   **Survival.** Provisions of this Agreement will survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including, without limitation, Section 3.2 and Articles 6 and 7 of this Agreement (each of which shall survive termination of this Agreement). Upon termination of the Employee's employment with the Company by either the Employee or the Company, all rights, duties and obligations of the Company to the Employee will cease, except as otherwise expressly provided in this Agreement.

4.6   **Severance.** In the event employment is terminated by the Company without cause, the Employee will be eligible for a severance payment equal to his previous year's W-2 earnings, payable in 12 monthly installments.

5.   **ASSIGNMENT.** The Employee shall not assign this Agreement without the prior written consent of the Company. The Company may assign this Agreement and the Employee hereby consents to any such assignment. This Agreement shall be binding on, and shall inure to the benefit of, the Parties and their respective heirs, legal representatives, successors and permitted assigns.

6.   **CERTAIN COVENANTS, REPRESENTATIONS AND WARRANTIES BY THE EMPLOYEE.**

6.1   **Restrictive Covenants.** This Agreement contains restrictive covenants made by the Employee. The Employee acknowledges that certain of the Company's personnel, methods of operation, business relationships, products and services are highly specialized and that the Confidential Information (as hereinafter defined) to which the Employee will have access is not generally known in the Company's industry. The Employee further acknowledges that the Company has a legitimate interest in protecting its ability to effectively compete in its industry and that it is reasonably necessary for the protection of the Company's business interests for the Employee to agree to the restrictive covenants set forth in this Agreement.

6.2   **Certain Definitions.** For purposes of this Agreement the following capitalized terms shall have the meanings ascribed to them below:

"**Cause**" shall mean any of the following:

(a)   Any omission, act or conduct on Employee's part that amounts to gross negligence or willful misconduct to the detriment of the Company or that has materially injured the business or reputation of the Company or that has otherwise materially and adversely affected the interest of the Company or that might so materially injure the business and reputation of the Company or so affect its interest if Employee were retained as an employee including, but not limited to, acts of violence, dishonesty, embezzlement, fraud, misappropriation, conviction of a crime (other than a summary offense), substance abuse or a plea of nolo contendere with respect to any of these actions;

(b)   Willfully destroying Employer's property.

"**Confidential Information**" shall mean all oral, written or other confidential and proprietary information or ideas in any form, tangible or intangible, of or

3

relating to the Company or its business including, but not limited to, information pertaining in any manner to the business or affairs, financial or otherwise, of the Company or any of its employees, Customers, consultants or business associates. Confidential Information includes, without limitation: designs, inventions, innovations, patents, patent applications, discoveries, improvements, specifications, data, know-how, formats, test results, documentation, components, business and product plans, contracts and agreements, service offerings, specifications, financial information, customer lists, supplier lists, formulas, research techniques, research results, trade secrets, trademarks, service marks, marketing and sales plans, sales forecasts, price lists, quoting and pricing techniques and strategies, budgets, customer characteristics, personnel files, compensation information, identity of purchasing personnel in the employ of Customers and prospective customers, amount or kind of goods and services purchased from the Company by its Customers, sources of consultants, information provided to the Company by Customers and any other proprietary information that is produced during, generated by, procured during or utilized in the operations of the Company or its Customers. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged at any time during employment, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company or any Customer. Notwithstanding the above, Confidential Information shall not include any information which is or becomes part of the public domain, except for information which became part of the public domain as a result of disclosure of such information by the Employee in violation of this Agreement or the wrongful disclosure of such information by a third party. Additionally, Confidential Information shall not include the refurbishment processes for Sumitomo cold heads. The Employee acknowledges that all Confidential Information is and shall remain the exclusive property of the Company or its Customers, as the case may be.

"**Company Materials**" shall mean the various writings, correspondence, notes, manuals, plans, drawings, designs, specifications, computer files, source code and other documents and records of the Company or Customers in which Confidential Information is contained, regardless of (i) the form of media in which it is contained, (ii) whether or not labeled or identified as "confidential," and (iii) whether or not prepared in full or in part by the Employee.

"**Customer**" shall mean any individual, corporation, trust, partnership, business or other entity (each a "**Person**") who is, or was at any time within the two (2) year period prior to termination of the Employee's employment with the Company, a customer of the Company.

"**Similar Business**" means a business engaged in providing any of the following: repair, refurbishment, installation, maintenance or support services for cryogenic refrigeration equipment, cryogen filling, cold heads, compressors, flexlines and absorbers for MRI systems, industrial vacuum pumps and other research applications other work or business performed or contemplated by the Company from time to time.

4

6.3     **Protection of Confidential Information.**

(a)     Acknowledgments by Employee.   The Employee acknowledges that (i) during his employment with the Company, the Employee has been and will continue to be afforded access to Confidential Information; (ii) public disclosure of such Confidential Information is likely to have an adverse impact on the Company and its business; and (iii) the provisions of this Article 6 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.

(b)     Nondisclosure and Nonuse of Confidential Information.   During his employment with the Company and at all times after the termination of the Employee's employment with the Company, the Employee  (i) shall maintain all Confidential Information in strict confidence; (ii) shall not disclose any Confidential Information, directly or indirectly, to any third party except as required by the Employee's duties of employment with the Company or as permitted in advance by the Company in writing; (iii) shall not use any Confidential Information to the detriment of the Company and/or for the benefit of the Employee or any other third party; (iv) shall not authorize or permit any use or disclosure of Confidential Information by any other person or entity; and (v) shall comply with the policies and procedures of the Company regarding use and disclosure of Confidential Information.

(c)     Use and Return of Company Materials.   The Employee shall not copy any Company Materials except to the extent necessary in connection with the Employee's employment, nor remove any Company Materials or copies thereof from the premises of the Company except to the extent necessary for the Employee's employment and then only with the express authorization of the Company. The Employee shall return to the Company all Company Materials and copies thereof in the Employee's possession or control immediately upon request of the Company at any time during or after the term of his employment with the Company.

(d)     Notification.   The Employee shall promptly advise the Company in writing upon learning of any unauthorized use or disclosure of Confidential Information.  If the Employee is required or reasonably expects to be required to disclose the Confidential Information pursuant to an order of a court or regulatory agency, then the Employee shall, as soon as practicable prior to such disclosure, give the Company sufficient prior notice and reasonable assistance to contest or limit such order.

6.4     **Invention Protection.**

(a)     Work Made for Hire.   The Employee recognizes and understands that his duties at the Company may include the preparation of materials, and that any such materials conceived or written by him were done and shall continue to be done as "work made for hire" as defined and used in the Copyright Act of 1976, 17 USC 1 et seq.  In the event of publication of such materials, the Employee understands that since the work is a "work made for hire," the Company will solely retain and own all right, title and interest in and to all such materials, including the right to copyright.

(b)     Disclosure of Existing Discoveries, Ideas and Inventions.   The Employee represents that he does not have any right, title or interest in, nor has he made or

5

conceived wholly or in part prior to the Effective Date (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), any discovery, idea and/or invention, which is related to or could be used in the conduct of the Company's business.

(c)     Disclosure of other Discoveries, Ideas and Inventions/ Assignment of Patents.  The Employee shall disclose promptly to the Company, (i) any and all works, inventions, discoveries, ideas and/or improvements authored, conceived or made by the Employee during the period of his employment with the Company (including, but not limited to, during the period of the Employee's employment with the Company prior to the Effective Date), whether developed solely by the Employee or jointly with others, which are related to the lines of business, work or investigation of the Company at the time of such work, and (ii) inventions, discoveries, ideas and/or improvements which result from, or are suggested by, any work which the Employee may do for or on behalf of the Company (the items described in subparagraphs 6.4(c)(i) and (c)(ii) are collectively referred to as "**Inventions**").  The Employee hereby assigns and agrees to assign all of her right, title and interest in and to all Inventions to the Company or its nominee.  Whenever requested to do so by the Company, the Employee shall execute any and all applications, assignments or other instruments which the Company shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country or to otherwise protect the interest of the Company in and to any Inventions and shall assist the Company in every proper way (entirely at the Company's expense, including reimbursement to the Employee for all expense and loss of income) to obtain such patents and copyrights and to enforce them.  The Employee's obligations pursuant to this Section 6.4(c) shall continue beyond the termination of his employment with respect to works, inventions, discoveries, ideas and improvements authored, conceived or made by the Employee during the period of his employment with the Company, and shall be binding upon the Employee's assigns, executors, administrators and other legal representatives.  All such Inventions shall remain the sole and exclusive property of the Company, whether patentable or not.

6.5     **Covenant Not to Solicit Employees.**  During his employment and for a period of one (1) year after the expiration or earlier termination of the employment, the Employee shall not, directly or indirectly, and will not assist, directly or indirectly, any other Person to solicit, hire or engage in any capacity any employee or independent contractor of the Company (or any Person who was an employee or independent contractor of the Company within three (3) months prior to the date of the Employee's termination) or solicit or seek to persuade any employee or independent contractor of the Company to discontinue employment with the Company.

6.6     **Covenant Not to Solicit Customers.**  The Employee shall not, for a period of one (1) year after the effective date of the termination of Employee's employment with the Company, directly or indirectly contact, solicit or accept the business of any Customer.

6.7     **Covenant Not to Compete.**  Subject to Section 6.9, the Employee shall not, during his employment and for a period of one (1) year after the termination of the Employee's employment with the Company, alone or in conjunction with any other Person, whether as an employee, consultant, sole proprietor, partner, shareholder, officer, director, joint

6

venturer, investor or in any other capacity, directly or indirectly, engage in any Similar Business anywhere in the United States of America.

        6.8    **Exceptions to Non-Competition Covenant.** Notwithstanding anything in Section 6.8 to the contrary, the non-competition covenant set forth in Section 6.8 shall not apply to Employee following termination of employment (a) in the event that the Company fails to contribute an annual amount equal to or greater than the annual amount the Company is contributing as of the Effective Date for health care insurance benefits for Employee and Employee terminates employment with the Company within ten (10) days after becoming aware that the Company diminished its contribution towards Employee's health care insurance coverage, or (b) in the event that Employee's employment with the Company is terminated by the Company without Cause.  Section 6.8 shall be binding upon the Employee following termination of employment for any other reason including, but not limited to, termination by Employee for any or no reason and termination by the Company for Cause.  The covenants in Sections 6.6 and 6.7 shall remain binding regardless of which party terminates Employee's employment or whether such termination was for any or no reason (including Cause).

        6.9    **Miscellaneous.**

        (a)    **Tolling.**  The time periods specified in Article 6 shall extend by the length of any time during which the Employee is in breach of any of the restrictive covenants contained herein.

        (b)    **Notice of Employment.**  The Employee shall, while the covenants under this Article 6 are in effect, give notice to the Company, within ten (10) days after accepting employment with another employer, of the identity of the Employee's new employer.  The Company may notify such employer that the Employee is bound by this Agreement and, at the Company's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

        (c)    **Unique Agreement.**  The Employee agrees that each of the covenants set forth in this Article 6 are separate and distinct covenants, independent of each other, and that the illegality or invalidity of any one (1) or more of them or any part of one (1) or more of them shall not render the others illegal or invalid, and that if the invalidity or unenforceability of a covenant is due to the unreasonableness of the scope of activities or the time or geographical area covered by said covenant, said covenant shall nevertheless be enforced to the maximum extent permitted by law and effective for such scope of activities or period of time and for such area as may be determined to be reasonable by a court of competent jurisdiction.  The Employee hereby consents and agrees that the scope of such covenants may be modified in any proceeding brought to enforce such covenants and restrictions.

        7.    **RELIEF.**

        7.1    **WAIVER OF JURY TRIAL.**  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE COMPANY'S EMPLOYMENT OF THE EMPLOYEE.

8.    GENERAL AND MISCELLANEOUS PROVISIONS.

    8.1    **Amendments; Waiver.** No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

    8.2    **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties pertaining to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties relating to such subject matter; provided that the Employee shall, in addition to this Agreement, be subject to the employment policies of the Company as in effect from time to time.

    8.3    **Choice of Law.** This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, including, without limitation, the Pennsylvania Uniform Trade Secrets Act, and without giving effect to the conflict of law provisions. Employee consents to the personal jurisdiction of Pennsylvania courts located in Allegheny County, Pennsylvania for the purposes of interpreting and enforcing this Agreement, including the federal courts sitting in Pittsburgh, Pennsylvania, and those courts shall be the sole and exclusive venue for the parties with regard to any disputes that arise under or pursuant to this Agreement.

    8.4    **Severability.** In the event that any one (1) or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason in any jurisdiction, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained in this Agreement shall not be in any way impaired thereby. It is in the mutual interest of Employee and the Company that all of the rights and privileges of the Parties hereto shall be enforceable to the fullest extent permitted by law.

    8.5    **Counterparts; Facsimile Signatures.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one (1) and the same instrument. All signatures of the Parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

    8.6    **Changes; Amendments.** No changes or amendments to this Agreement may be made without written agreement of both parties. This includes, but is not limited to, changes in compensation.

    8.7    **Advice of Counsel; Interpretation, Headings.** THE PARTIES ACKNOWLEDGE AND AGREE THAT THEY HAVE CONSULTED WITH COUNSEL OR HAD AN ADEQUATE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THE TERMS SET FORTH HEREIN. THIS AGREEMENT REPRESENTS THE PRODUCT OF EXTENSIVE NEGOTIATIONS BY THE PARTIES, AND IT SHALL BE INTERPRETED ACCORDING TO ITS FAIR MEANING AND NOT FOR OR

AGAINST ANY PARTY.  THE SUBJECT HEADINGS OF THE ARTICLES, SECTIONS, PARAGRAPHS AND SUBPARAGRAPHS OF THIS AGREEMENT ARE INCLUDED FOR PURPOSES OF CONVENIENCE ONLY AND SHALL NOT AFFECT THE CONSTRUCTION OR INTERPRETATION OF ANY OF ITS PROVISIONS.

IN WITNESS WHEREOF, each of the Parties hereto has executed this Agreement as of the date first above written.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.]

[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]

**PITTSBURGH UNIVERSAL, LLC d/b/a
COOL PAIR PLUS,**

By:
Name:
Title:

**EMPLOYEE**

SEAN MYKLEBY

3/4/11

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Sean Mykleby
2631 N. Bradford Dr.
Arlington Heights, IL 60004

9590 9401 0077 5168 5529 11

2. Article Number (Transfer from service label)

7015 0640 0002 9373 5941

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt